385 So.2d 1269 (1980)
Colonel Amos RICHARDSON et al., Plaintiffs-Appellants,
v.
Joseph Croyce SCRANTZ et al., Defendants-Appellees.
No. 7635.
Court of Appeal of Louisiana, Third Circuit.
June 25, 1980.
Dubuisson, Brinkhaus & Dauzat, William A. Brinkhaus, Opelousas, for plaintiffs-appellants.
Sandoz, Sandoz & Schiff, Lawrence B. Sandoz, Jr., Opelousas, for defendants-appellees.
Before CULPEPPER, SWIFT and STOKER, JJ.
CULPEPPER, Judge.
This is a boundary action. Plaintiffs, Colonel Amos Richardson and Mary Prince Richardson, brought suit to establish the boundary between their property and that of defendants, Joseph Croyce Scrantz and Zettie Schilling Scrantz. Defendants contend a visible boundary exists up to which they have possessed for more than 30 years. They allege acquisitive prescription of 30 years under LSA-C.C. Article 852, now replaced by Article 794. From an adverse judgment, plaintiffs have appealed. We affirm.
The issue on appeal concerns a fence defendants contend is the visible boundary to which they and their ancestors in title have possessed. The question is whether the fence existed and has been continuously maintained for more than 30 years prior to the time this suit was instituted on June 6, 1974.
The facts show plaintiffs and defendants have record title to adjoining tracts of land in the Atchafalaya basin in St. Landry Parish. Plaintiffs' land is described of record as all of Section 16, Township 7 South, Range 7 East. Defendants' land is described as all of Section 9, except certain portions not pertinent here. The true section line dividing Sections 9 and 16 was established in a survey performed by William H. Jarrell, Jr. by order of the lower court. A survey performed at defendants' request by Edmond E. Dupuy, Jr. shows the fence almost parallel to and some 660 feet south of the section line. Along with the levee and Bayou Courtableau, the fence forms one side of a roughly triangular enclosure, which is completed by short fence lines not *1270 at issue here. The area in dispute is the 25 acres lying between the true section line and the fence in question.
There is no evidence in the record as to who built the fence or when it was built. Defendants' ancestor in title, who owned the property from 1940 to 1961, Mrs. Norma Vicknair Kuhlmann, is now dead.
The existence of a fence at the time of Mrs. Kuhlmann's purchase was established through the testimony of Clinton C. Artigue, a retired fisherman 73 years old at the time of trial. Artigue first testified to seeing the fence between 1947-1948 when fishing at night in two slews emanating from Bayou Courtableau and running north to south on the property. Fishing with him was Abra Artigue, who testified the fence was strung across both slews.
Clinton Artigue further testified to seeing the fence when hunting on the property. He stated as follows:
"Q. And you mentioned rabbit hunting were you rabbit hunting at night or in the daytime?
A. In the daytime most of the time.
Q. And you mentioned you came up to this fence. From which direction were you comingNorth or South?
A. Usually from the North.
Q. Now, what years did you rabbit hunt in this area?
A. WelluhI guessI don't know 1940 onoff and on, you know. I'd be (inaudible) but with dogs, I'd say from 1940 onoff and on, you know.
Q. Were youandwell, did you go at different points along this fence with your hunting, or just one particular area?
A. No, siryou seeyou woulduh rabbit hunting you'd just go all over the woods, you knowI meanyou get up to the fenceclose to the fenceand you'd vary along one way or the other, you knowjust going through the woods.
Q. And how many years did you rabbit hunt in that area?
A. Well, I'd say fromsome time in the early '40's on throughwell, till about three years ago."
Clinton Artigue also testified as to the purpose of the fence as follows:
"Q. Let melet's go back to the old fence. Do you know who built who strung that wire across the trees that you saw when you crossed those slues?
A. No, sirI wouldn't know.
Q. Do you know when it was built?
A. No, sirI don't.
Q. Do you know what purpose it was built for?
A. Yes, sir. To put cattle in.
Q. Across theacross the trees in the slue?
A. That
Q. We're talking about the fence you
A. Across the slues, where the fence wasyou're referring to where we had to go under?
Q. Yes, sir.
A. Well, across the slues that was to keep the cattle from going out, you see. They had to build across the slues, toobecause the slues, in the summer time, would go practically dry, you see,and cattle is something that will get in water and go on through. I don't know whether you know anything about cattle or not.
Q. Did you see any cattle there?
A. Yes, sir.
Q. At nightyou saw cattle there?
A. In daytime.
Q. You saw cattle there?
A. At that very placeyou know where I'm referring to? You mean
Q. YeahI'm taling about right there.
A. Right thereyes, sir.
Q. You saw cattle there?
A. Certainly.
Q. Whose cattle were they?
*1271 A. They're supposed to have been Mrs. Kuhlmann's cattle old Mrs.uhI forget her name now,but Mrs. Kuhlmanthe one that
Q. Do you know that for a fact?
A. I guess I doI've seen it myself, and I
Q. What?
A. I guess I doI've seen it myself, and I knew that the old lady's cattleuhI mean, her cattle and her fence had been put therefor that purpose.
Q. In '47?
A. In '47yeah
Q. Mr. Artigue
A. I meanbeforebefore /47.
* * * * * *
A. That's what I was reffering to. I know there was some cattle there, because I've seen them myself
Q. Yeah, and
A. went rabbit hunting in daytime and seen them.
* * * * * *
Q. All rightlet's back up. Did Mrs. Kuhlmann have a brand?
A. Yes, sir.
Q. You saw the brand?
A. Yes, sir.
Q. Did you see any Scrantz cattle up there?
A. No, sir.
Q. Now you say that you went rabbit hunting up there.
A. That's right.
Q. Did you run across the fence when you were rabbit hunting?
A. I went up to the fenceyes, sirI didn't go across the fence."
Four members of the Scrantz family testified on defendants' behalf, including defendant Joseph and his brothers, Emery, Sherby and Calvert. The Scrantz family moved onto nearby property in 1947, and the brothers all stated they saw the fence then. Sherby Scrantz, who showed the greatest familiarity with the disputed area, stated he frequently visited in the area as early as 1943 when his father first bought their homestead. He stated logging was done on the property in 1945-46 "from the fence."
There is no doubt the fence fell into some disrepair during Mrs. Kuhlmann's ownership. The area is subject to annual flooding and heavy silting. Sherby Scrantz testified, however, that Mrs. Kuhlmann allowed him to use the property and two years before Mrs. Kuhlmann's death, he found the fence again. Trees had fallen on the fence and briars had taken over parts, but Sherby described the fence as "goodall the way around."
When Mrs. Kuhlmann died, the property was inherited in 1962 by her sister, Mrs. Mathilda V. Story. Clinton Artigue made arrangements with Mrs. Story to use the land, and in 1963 he built another fence. He described his work as follows:
"A. That's right. And thenuhI had my cattle there, you see, and I got some cattle out of the oil field some more cattle, and they were real wild, so I asked Mrs. Story about fencing in on the riverside, seethe old fence
Q. What year was that?
A. That waswell, I would say in '63 or '64something like that. When I asked to put this fence here, you see,and she told me to go ahead and she said, `I'd like to have it fenced in. So, just go ahead and do what you want with it.' We were good friends and she didn't charge me anything for the rentyou wouldn't hear anything about the rent.
Q. All rightwould you state whether or not you built this fence in the new area or not?
A. No, sirI tried to follow the old fence. But, you seeI didn't try to follow the old fence, I wanted to be on the inside of the old fence,and, soon account of they was cutting timber on the South side of Ms.
*1272 Story's place, and I was putting wild cattle in there, sothe cattle that I captured out of the oil fieldI had a bunch of cattle in oil field, and I'd catch a few of them at a time, you seeand kind of tame them a little; and I was going to put them back there. So I didn't want them to throw no trees on my fence because the cattle wouldmy wild cattle might get out, you see so I would rather have the fence a little on the inside than on the outside on the line, you seeso that's why I kept trying to put the fence on the inside of theher property instead of right on the line. It would keep them then from throwing treesin other words, they weren't suppose to cut on her property, so that way they wouldkeep them from having trees on my fence. Andon up herewell, I done the same thing here. I didn't follow thethe line right onI justand this fence here was nailed on the trees, except in places where the skip was too far apart, I used posts."
Sherby Scrantz testified that he accompanied Mr. Dupuy on his survey in 1975 and was still able to locate both fences. He stated the old and new fences were approximately 12-16 feet apart and may have come together at times.
The only evidence in opposition to all of the testimony from defendants' witnesses came from another one of the Scrantz brothers. Creighton Scrantz stated he never saw the fence in question in 1947.
In written reasons for judgment, the trial court stated:
"There is a fence with trenches on plaintiff's titled property, but the evidence is overwhelming that the defendant and his ancestors in title exercised dominion of all the land up to the fence,this being a `possession' rather than a title. As a matter of fact, the land is inside the Atchafalaya levee and periodically floods to a rather extensive depth.
"The Court finds the defendant has acquired title to the fence and so decrees."
The applicable law was recently explained in the case of Leblanc v. LaBorde, 368 So.2d 1126 (La.App. 3d Cir. 1979) where we stated:
New LSA-C.C. Article 794 provides:
"When a party proves acquisitive prescription, the boundary shall be fixed according to limits established by prescription rather than titles. If a party and his ancestors in title possessed for thirty years without interruption, within visible bounds, more land than their title called for, the boundary shall be fixed along these bounds."
This article became effective January 1, 1978, and applies to this action since suit was not filed herein until January 6, 1978. The new Article 794 replaces Article 852 of the Louisiana Civil Code of 1870 but does not change the law as stated within Article 852, nor does it affect the line of jurisprudence which developed in interpreting Article 852.
Under Article 8521, and now under Article 794, where there is a visible boundary and where there has been actual uninterrupted possession, either in person or through ancestors in title, for thirty years or more of the land extending beyond that described in the title and embraced within the visible bounds, then the party who possesses acquires the right to the land beyond their title. William T. Burton Industries, Inc. v. Wellman, 343 So.2d 996 (La.1977); Brookshire v. Guidry, 355 So.2d 559 (La.App. 3 Cir. 1978).
The requirements of these articles indicate that one must maintain an enclosure, such as a fence, around the property and exercise open, physical possession as owner for a continuous and uninterrupted period of thirty years. Martin Timber Company v. Taylor, 187 So.2d 196 (La.App. 3 Cir. 1966). There must have been not only evidence of a corporeal possession of the property for the required period of time, but also a positive intent to possess as the owner *1273 shown by the possessor during the time. William T. Burton Industries, Inc. v. McDonald, 346 So.2d 1333 (La.App. 3 Cir. 1977). Finally, the tacking of possession of all predecessors in title is permitted for acquisitive prescription beyond title to a visible boundary. Dubois v. Richard, 223 So.2d 198 (La.App. 3 Cir. 1969).
* * * * * *
It is well settled that in a boundary action, where the boundary is located is a question of fact to be determined by the trier of fact, and such a determination should not be reversed on appeal in the absence of manifest error. Gelpi v. Shall, 355 So.2d 1014 (La.App. 4 Cir. 1978).
Based on the evidence in the record, we cannot say the trial court manifestly erred. Defendants have shown the existence of the fence and possession to the fence by defendants and their ancestors in title for more than 30 years. Defendants have further shown sufficient maintenance of the fence to establish the present fence line as the boundary between plaintiffs' and defendants' adjoining tracts. See, Savoie v. Savoy, 252 So.2d 582 (La.App. 3rd Cir. 1972); Dubois v. Richard, 223 So.2d 198 (La.App. 3rd Cir. 1969).
For the reasons assigned, the judgment appealed is affirmed at appellants' cost.
AFFIRMED.